30 C.C.P.A. (Patents)

## BARTSCH v. BAKER.

## BAKER v. BARTSCH.

### Nos. 4638, 4639.

United States Court of Customs and Patent Appeals.

Dec. 26, 1942.

Rehearing Denied April 2, 1943.

Joshua R. H. Potts, Eugene V. Clarke, and Basel H. Brune, all of Chicago, Ill., for Bartsch.

S. Warwick Keegin, of Washington, D. C. (Semmes, Keegin, Beale & Semmes, of Washington, D. C., of counsel), for Baker.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

These cases (consolidated below and disposed of in single decisions by the respective tribunals of the Patent Office) present appeals from the decision of the Board of Appeals affirming that of the Examiner of Interferences in an interference declared by the Primary Examiner which, in its final form, involved two counts reading as follows:

"1. A dish for maintaining food at a desired temperature comprising a body of pottery or like material having an annular upper surface, a side wall and a base, a metallic fluid container attached to the pottery body to form a fluid retaining cavity, an annular ridge on the outside of the pottery body below the upper surface, the upper edge of said metallic fluid container being crimped over the annular ridge so that it lies below the upper surface and forms a tight fit with the pottery body out of normal contact with food during use and serving to maintain the container and pottery body in assembled position, said annular upper surface of the body having a filling opening therethrough adapted to be closed in use.

"2. A dish for maintaining food at a desired temperature comprising a body of pottery or like material having an annular upper surface, a side wall and a base, a metallic fluid container attached to the pottery body to form a fluid retaining cavity, an annular ridge on the outside of the pottery body below the upper surface, the upper edge of said metallic fluid container being crimped over the annular ridge so that it lies below the upper surface and forms a tight fit with the pottery body out of normal contact with food during use and serving to maintain the container and pottery body in assembled position, said fluid retaining cavity having a filling opening adapted to be closed in use."

The decision appealed from awarded priority as to count 1 to the party Baker, and the party Bartsch appealed as to that award. Priority as to count 2 was awarded

to the party Bartsch, and the party Baker appealed as to that award.

■ The interference was declared between applications. The application of Bartsch (serial No. 237,569) was filed October 28, 1938. The application of Baker (serial No. 242,409) was filed November 25, 1938. So, the burden rested upon Baker as the junior party to establish priority by a preponderance of the evidence.

It may be said that count 1 was suggested to the parties by the examiner under Patent Office rule No. 96, while count 2 was suggested by the party Bartsch.

The following descriptive matter is quoted from the decision of the Examiner of Interferences:

"This interference relates to a dish for maintaining food at a desired temperature. The type of dish disclosed in the applications of the parties consists of a food containing part set into and sealed to a metal jacket in such manner that a cavity is provided between the food containing part and the jacket. A suitable opening leading into the cavity and a closure member therefor permit filling the cavity with hot water for supplying heat to food placed in the food containing part, and closing the opening when the dish is in use.

*       *       *       *       *

"The devices disclosed in the involved applications of the parties are 'baby dishes' or dishes designed to be used in feeding babies or small children, but the counts are not limited to dishes of that type. The party Bartsch, therefore, has taken considerable testimony with respect to the making, testing, and selling of a number of different types of utensils which have certain features in common with the devices disclosed in the applications, but which are not designed for use as baby dishes. None of the testimony introduced for this purpose has been attacked by the party Baker in respect to its probative force, and certain facts are deemed to be so clearly established thereby as to require no extended discussion."

It will be observed that count 1 contains a limitation reading "said annular upper surface of the body having a filling opening therethrough adapted to be closed in use," and count 2 contains the limitation "said fluid retaining cavity having a filling opening adapted to be closed in use." Since the *location* of the filling opening, as

stated in count 2, is not confined to the annular upper surface of the food containing part that count obviously is broader than count 1.

Both parties took testimony and the evidence introduced includes numerous documentary and physical exhibits so that the record in the case is quite voluminous. It was reviewed at length by both the Examiner of Interferences and the board. Notwithstanding the extensive record, the issues, in the final analysis, are comparatively simple and, under the view which we take of the case, it is not necessary for us to set forth an extensive review of the evidence.

It will be conducive to clearness, however, to state, at this point, something of the background of the respective parties. During the period here pertinent the party Baker was sales promotion manager for Gerber Products Company (to which his application is assigned), a company engaged in the manufacture and sale of foods, particularly foods for infants and small children. It appears that it was the practice of the company to offer premiums to purchasers as an incentive to promoting sales, and the party Baker in 1937, or at least by 1938, became interested in the development of a dish for premium purposes in which such foods might be maintained at a desired temperature. His activities in this regard will be later discussed in more detail.

The party Bartsch was engaged in the manufacture of articles of aluminum ware, such as a specially designed pie plate, a whistling teakettle, an aluminum milk warmer, etc., and in 1937 he manufactured certain beverage warmers for a concern known as the KrimKo Company. Exhibits illustrative of such articles were placed in evidence. The first meeting between Baker and Bartsch seems to have taken place in August 1938 when the latter visited the former at his place of business seeking to interest him in a device or devices for premium use. Such details relating to this occurrence as are necessary will be set forth hereinafter.

At the hearing the question of originality was raised by both parties as to count 1 and the tribunals below agreed in holding that the feature of that count expressed in the limitation relative to the opening through which the fluid is introduced into the cavity between the pottery body and the metal part being located in the annular

upper surface of the pottery body, was the conception of the party Baker and that the party Bartsch derived the same from him.

This holding upon the question of originality was limited to count 1, and it was held by both tribunals that, as expressed by the board: "* * * if it should be decided that Baker did not disclose to Bartsch the real essence of count 1, then priority should be awarded to Bartsch on the ground that although Baker might be held the first to conceive this count, he would be the last to reduce to practice and there is no satisfactory showing of diligence."

As to the broader count (No. 2) both tribunals, under the construction which they placed upon it, held that the party Bartsch had reduced the invention therein described to practice prior to the earliest activity claimed by the party Baker. The holding was based upon the production by Bartsch of devices illustrated by Bartsch's exhibits 1, 3, 7, and 14 (frequently referred to in the record as "KrimKo cookers"), during the year 1937. The Examiner of Interferences stated:

"The various structural limitations of count 2 are fully supported by Bartsch exhibits 1, 3, 7, and 14, and it must be concluded, therefore, that Bartsch reduced the invention of count 2 to practice at least by the end of 1937. This date is prior to the earliest date alleged in Baker's preliminary statements, and Bartsch is, therefore, entitled to prevail as to count 2."

The contention made on behalf of the party Baker with respect to count 2, which most logically may be first considered, is that the introductory phrase "A dish," etc., is a material limitation, and that the devices manufactured and marketed by the party Bartsch in 1937 do not support count 2. Specifically it is urged (we quote from the Baker brief) "that none of these exhibits constitutes 'a dish' or a 'dish for maintaining food at a desired temperature' within the meaning of that language as set forth in Count 2." It is claimed, first, that the devices fail to meet the dictionary definition of the word "dish" and, second that (we again quote from the Baker brief), "The Testimony Taken on Behalf of Bartsch Definitely Establishes That the KrimKo Cooker Is Not a Dish." Hence, it is contended that the manufacture of those articles did not constitute a reduction to practice by Bartsch of the invention described in count 2.

Neither of the tribunals below gave detailed description of any of the physical exhibits introduced. As we understand it, an article introduced as Bartsch's exhibit 59 is agreed to conform to the provisions of count 1. This seems to have been completed by Bartsch the latter part of September 1938. It consists of a cylindrical pottery part about 7½ inches in diameter having sloping sides and a depth of approximately an inch and a half. It is sealed in a cylindrical metal container, a cavity being left between the pottery and metal parts, and has an opening in the upper portion of the surface of the pottery element which is closed by a cork attached to a metal cap or top.

Bartsch's exhibit 14 is apparently typical of the other three exhibits (1, 3, and 7) and may be taken for purposes of comparison. It consists of a cylindrical enameled metal vessel about 4 inches in diameter and 5½ inches in depth sealed in a metal jacket, the jacket having an opening about an inch below its top through which fluid may be introduced to fill the cavity left between the bottom of the enameled part and the bottom of the jacket part. The opening is made in the top of a short spout and a metal cap is provided for closing the opening.

From the foregoing descriptions it is obvious that in shape and appearance exhibits 1, 3, 7, and 14 differ greatly from exhibit 59, and it may be conceded that the former exhibits would not be thought of as "baby dishes," while the latter from its appearance and conformation would be regarded as a "baby dish," but, as has been said, neither of the counts is limited to a baby dish, and neither of them is limited as to dimensions. The Examiner of Interferences said:

"The counts call for 'a dish for maintaining food at a desired temperature.' The term 'dish,' as used in the counts, is believed to be broad enough to include such devices as Bartsch exhibits 1, 3, 7, and 14, for such devices are adapted to be used for the very purpose recited in the claims, and would be made with varying structural proportions depending upon the particular type of food to be warmed or maintained warm therein. From the functional point of view, such devices and the baby plates disclosed in the applications of the parties, may both be considered as utensils for the same general purpose. Considering all factors, it is not believed justifiable

to construe the introductory phrase of these counts so narrowly as to exclude devices like Bartsch exhibits 1, 3, 7, and 14."

This holding was approved by the board, and we are not convinced that it was erroneous.

■ The dictionary definitions and the testimony cited by counsel for the party Baker, to which we alluded above, have been fully considered by us. As of course, we are not concerned here with the matter of appearance but solely with structure, and we are unable to discern any sound reason for holding that the introductory phrase of the counts, "A dish for maintaining food at a desired temperature," should be regarded as a limitation affecting the actual structure which the counts describe.

The decisions below, awarding priority as to count 1 to the party Baker, as already has been indicated, were predicated solely upon the question of originality, it being held that locating the opening for the introduction of fluid into the cavity on the annular upper surface of the food containing part of the device was conceived by the party Baker and by him disclosed to the party Bartsch in August 1938. This holding is attacked by counsel for Bartsch, it being claimed that the feature was, in fact, conceived by Bartsch and by him disclosed to Baker.

Obviously, the first inquiry to be made is whether the evidence supports the holding as to Baker's *conception* of the feature under discussion. If he did not conceive it he could not have disclosed it.

■. In the decision of the Examiner of Interferences the evidence upon which he based his holding (approved by the board) that Baker is shown to have established conception of that feature and disclosure thereof to certain of his business associates at least as early as June 15, 1938, is carefully reviewed. It is unnecessary to repeat that review here. We have examined the evidence in detail and are of opinion that it fully sustains the conclusion which the tribunals reached. In other words, we think it was established by the evidence (although it consisted wholly of oral testimony) that Baker, at least as early as June 15, 1938, had conceived the feature embraced in the limitation under discussion, and disclosed it to certain of his business associates.

The second query to be answered is whether the party Baker having conceived this feature made disclosure of his conception to the party Bartsch as was found by the tribunals below.

The evidence upon this point is meagre with respect to both parties. It consists almost wholly of their own oral testimony as to what was said during two interviews between them (no other persons being present) on August 5, 1938 and August 15, 1938, respectively, and, as stated by the tribunals below, this testimony is conflicting.

We quote the following from the decision of the Examiner of Interferences (omitting page references):

"The parties Baker and Bartsch met in the office of the former on August 5, 1938, at which time no other persons were present, and Bartsch attempted to interest Baker in some kind of premium for use in promoting the sales of the Gerber Products Company. At that time Bartsch had with him a warming pan like Bartsch exhibit 67, which meets all the limitations of count 1 except that relating to the location of the filling opening for the warming fluid. There is no evidence that Bartsch, prior to this meeting, ever had a conception of a warming dish of the style of the baby dishes shown in the applications of the parties, or that he had a conception of locating the filling opening in the upper surface of the insert of any of his earlier devices.

"It appears from the testimony of both Baker and Bartsch that Baker was not interested in a device like Bartsch exhibit 67, but that he displayed considerable interest in a similar device designed for use as a baby dish. Baker claims that he explained to Bartsch his ideas as to how such a dish should be constructed, with particular emphasis on the features set forth in the interference counts * * *. Bartsch, on the other hand, contends that he explained how he could redesign his exhibit 67, by merely changing its proportions, so as to make a dish suitable for Baker's purposes, and he denied that Baker described any kind of a dish to him and mentioned only that the Gerber Products Company was considering an all pottery dish * * *. However, Bartsch admitted that Baker was the first to mention putting the filling opening in the top surface of the insert before he had a chance to explain in detail how he would handle that feature * * *."

The statement in the last sentence of the above quotation was based upon testimony given by the party Bartsch (during his direct examination) with respect to what was said during the interview on August 5, 1938. We here quote the questions and answers:

"Q 943. During the conversation on your first talk with Mr. Baker, did Mr. Baker ask you anything about a hole? A. Yes, he did. Before I had a chance to mention in detail how I would handle that part of the device he asked whether the hole couldn't be put on the top?

"Q 944. And what did you tell him? A. I told him nothing would be simpler than that if made in metal."

Counsel for the party Bartsch argue with great earnestness that the tribunals of the Patent Office gave undue weight to the foregoing testimony. In so doing they seem to have believed that the testimony was relied upon by those tribunals to establish conception on Baker's part. We do not so understand the decisions. We understand that the testimony was cited not with reference to conception, but with reference to disclosure of the feature which already had been conceived. Upon that phase of the inquiry we think it was properly given weight.

It is certainly true that there is no evidence of record that the party Bartsch ever had a conception of locating the filling opening in the manner required by count 1 prior to his first interview with the party Baker on August 5, 1938. It is equally true, in our opinion, that Baker did have a conception of so locating it prior to that time, and it seems a most natural conclusion that, having such conception in mind, Baker disclosed it to Bartsch.

We quote again from the decision of the Examiner of Interferences: "In view of the fact that Baker had previously disclosed to others all the features of count 1 (including the location of the filling opening) as they should be employed in making a device of suitable baby dish proportions, it is not at all unlikely that he disclosed these same features to Bartsch. Bartsch, on the other hand, does not appear ever before to have contemplated making a baby dish. The devices in evidence which he had previously made were so constructed that the filling opening could not have been placed as required by count 1, and Bartsch admitted that Baker was the first to suggest placing the open-

ing in the top surface of the insert. Considering this admission along with the other circumstances, it is held that Baker has clearly established disclosure to Bartsch of the only feature of count 1 which differentiates it from count 2 prior to any proved date of conception of that feature by Bartsch. It also seems clear that Baker had an understanding of all the other features of count 1 at the time he suggested the location for the filling opening, and that his suggestion was sufficient to enable one skilled in the art to embody the invention in operative physical form. Baker, therefore, must be held to be the originator of the invention of count 1 and entitled to prevail as to this count without proving reduction to practice prior to his filing date or diligence at any time."

The company with which Baker was associated was engaged solely in the manufacture and sale of foods of a particular kind. It was not engaged in, nor, so far as the record discloses, did it have any intention of engaging in, the manufacture of utensils to be used in connection with the serving of such foods. The party Bartsch was not engaged in the manufacture of foods, but in the manufacture of utensils which might contain foods. There was no industrial rivalry between the parties.

The record discloses that one of the reasons the officials of the Gerber Products Company desired a dish having an opening located as is provided in count 1 was for convenience in packing for transportation. Utensils having spout openings located in their sides, such as exhibit 14 above described, could not be packaged as easily and neatly as those having an opening in the top, and we think it a reasonable surmise that this was one reason why the party Baker was not interested in the device illustrated by Bartsch's exhibit 67 shown him at the interview of August 5, 1938. Another reason probably was that the general conformation of the article did not adapt it to use as a baby dish.

Another circumstance, or fact, to which, we think properly, some weight was attached in the decisions below was that upon the occasion of Bartsch's second visit to Baker on August 15, 1938, he carried with him only a baby dish of conventional design, not having the opening feature located as Baker desired, nor did he then display any drawing or sketch showing the manner in which he proposed to make up

a dish which would meet the requirement of count 1. So far as we can determine from the record, no such drawing was made by, or for, Bartsch until early in September 1938.

Upon consideration of the evidence of record in the light of all the relevant circumstances, we are of opinion that the holding below upon the question of originality was proper, and that the decision should not be reversed as being against the weight of the evidence—the only ground upon which we could justify a reversal.

The decision of the board awarding priority to the party Baker as to count 1 and awarding priority to the party Bartsch as to count 2 is affirmed.

Affirmed.